1

2

3

4

5

6                          UNITED STATES DISTRICT COURT

7                          EASTERN DISTRICT OF CALIFORNIA

8

9    CRUZ FALCON DE LA CRUZ,                    No. 1:17-cv-00820-GSA

10                     Petitioner,

11        v.                                    **ORDER DIRECTING ENTRY OF**
                                                **JUDGMENT IN FAVOR OF NANCY**
12   NANCY A. BERRYHILL, Commissioner           **BERRYHILL, COMMISSIONER OF**
     of Social Security,                        **SOCIAL SECURITY, AND AGAINST**
13                                              **PLAINTIFF CRUZ FALCON DE LA CRUZ**

14                     Respondent.

15
16        **I.      Introduction**

17        Plaintiff Cruz Falcon de la Cruz ("Plaintiff") seeks judicial review of a final decision of

     the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application
18
     for Supplementary Security Income ("SSI") pursuant to Title XVI of the Social Security Act.
19
     The matter is currently before the Court on the parties' briefs which were submitted without oral
20
     argument to the Honorable Gary S. Austin, United States Magistrate Judge.[1]  *See* Docs. 16 and
21
     17.  Having reviewed the record as a whole, the Court finds that the ALJ's decision is supported
22
     by substantial evidence. Therefore, Plaintiff's appeal is denied.
23
          **II.     Procedural Background**
24
          On December 6, 2013, Plaintiff protectively filed an application for supplemental security
25
     income.  AR 24.  He alleged disability, specifically a right leg condition, depression, and mental
26

27   _____

     [1] The parties consented to the jurisdiction of the United States Magistrate Judge.  *See* Docs. 8 and 9.
28
                                                1

health issues, beginning January 1, 2013. AR 20. Plaintiff had previously applied for disability benefits, with those applications being denied in October 1995, September 1997, September 2000, and June 2012. AR 99; AR 236.[2]

The Commissioner denied the application initially on April 25, 2014, and upon reconsideration on June 11, 2014. AR 20. On June 18, 2014, Plaintiff filed a timely request for a hearing before an Administrative Law Judge. AR 20.

Administrative Law Judge Sharon L. Madsen presided over an administrative hearing on March 10, 2016. AR 35. Plaintiff, represented by counsel, appeared and testified. AR 35. An impartial vocational expert, Thomas Dachelet (the "VE") also appeared and testified. AR 35. In the course of the hearing, Plaintiff amended the alleged date of disability to October 1, 2014. AR 38.

On March 25, 2016, the ALJ denied Plaintiff's application. AR 20-29. The Appeals Council denied review on April 17, 2017. AR 1-4. On June 19, 2017, Plaintiff filed a timely complaint seeking this Court's review. Doc. 1.

### III.    Factual Background

#### A.    Plaintiff's Testimony

At the time of the administrative hearing, Plaintiff (born December 4, 1962) was homeless. AR 39. He had completed school through the seventh grade and had spent a substantial portion of his life before 1996 in custody. AR 40; AR 66. Although his opportunities for housekeeping and cooking were limited by his homelessness, Plaintiff testified that he was capable of keeping a house clean and cooking for himself. AR 41. He worked in various temporary and seasonal jobs, most recently packing potatoes and driving a small tractor. AR 43.

Plaintiff complained of constant pain in his lower back and legs, which was serious enough to require sleeping pills. AR 44. He had a cut on his lower left leg. AR 44. Sitting, standing, and walking were equally painful. AR 45. Sometimes, his right leg gave out while he

---

[2] The 1995 and 2012 administrative decisions and the 2012 hearing transcript are included in the record at AR 63-106; AR 111-113.

was walking.  AR 45.  His right hand was painful, and his fingers "locked up" three or four times monthly.  AR 49.  Plaintiff used a cane for balance.  AR 49.

According to Plaintiff, because he had stopped using heroin, he had stopped having frequent skin abscesses.  AR 46.  He had begun using methadone about a year earlier, which helped relieve his pain and allowed him to quit using heroin.  AR 47.  Plaintiff took Baclofen and Norco for pain, as well as medications for his stomach and liver.  AR 48.

Doctors had prescribed fluoxetine to treat Plaintiff's depression.  AR 51.  Plaintiff testified that he was suicidal but had not been able to secure psychiatric treatment.  AR 51.  He had difficulty concentrating and hearing.  AR 52.  He had "cut loose" his former friends and associates, and did not trust people.  AR 52.  When working, he tried to hide from his co-workers and foreman to mask his physical and mental problems.  AR 55-56.

Plaintiff could lift only ten or twenty pounds.  AR 49.  He could stand about a half hour before needing to sit, and sit about a half an hour before he needed to get up.  AR 49-50.  Although he found it difficult, Plaintiff could stoop, squat, and climb stairs.  AR 50.  He could walk "a couple of city blocks."  AR 50.

**B.     Third Party Function Report**

Plaintiff's mother, Bertha Falcon-DeLaCruz, provided an undated third party function report.  AR 249-57.  Ms. DeLaCruz stated that she knew little about Plaintiff's condition since he did not live with her.  AR 249.  Nonetheless, she opined that Plaintiff was stressed and depressed because no one would give him work due to "his past history."  AR 249.  Ms. DeLaCruz disclosed that Plaintiff used a cane which had not been prescribed for him, explaining, "He buys [it] at [the] dollar stor[e]."  AR 255.

**C.     Cassia Medical Center**

On February 19, 2012, Plaintiff went to the emergency department of Cassia Medical Center, Burley, Idaho, claiming he had run out of his prescription medications: Vicodin and Ambien.  AR 399.  Noting that it was Presidents' Day weekend, Lanny F. Campbell, M.D.,

///

3

provided Plaintiff with five Ambien and 21 Norco, but warned him that this was a one-time

occurrence and referred him to Family Health Services for future prescriptions.  AR 400.

On March 25, 2014, Dr. Campbell incised and drained a large abscess on Plaintiff's left

buttock.  AR 386-97.

On April 13, 2012, Plaintiff again visited Cassia Medical Center's emergency department

complaining of a liver infection and back pain and claiming that he had run out of his

prescription.  AR 404-14.  David L. Ontiveros, M.D., diagnosed chronic pain and prescribed

generic omeprazole and Norco, but warned Plaintiff that no further pain medication would be

prescribed in the emergency department.  AR 411.

**D**.        **Family Health Services (Idaho)**

Plaintiff sought treatment from Family Health Services in Burley, Idaho, on various dates

in 2013 and 2014.  AR 325-53.  He first saw Kelly Dustin, D.O., on January 8, 2013, and

requested medication to relieve chronic back, leg, and liver pain.  AR 351-53.  Because Plaintiff

disclosed his use of heroin and other street drugs, the doctor prescribed Trazadone for depression

and sleep problems but declined to provide pain management.  AR 351.  On February 11, 2013,

Plaintiff complained of back, hip, and right upper quadrant pain as well as overall aches and

pains.  AR 348.  Dr. Dustin noted that Plaintiff threatened to return to heroin or other street drugs

if he was not given a prescription for an effective pain medication.  AR 348.

On March 13, 2013, Plaintiff was seen for right kidney pain but tests showed no infection.

AR 347.  On April 10, 2013, Plaintiff complained of a "liver infection" that was "going to

explode out of his abdomen."  AR 345.  He sought pain pills, telling Physician Assistant Ellen

Judd that he would take his life if he could not get pain relief.  AR 345.  Judd noted that Plaintiff

looked well and had no evidence of a chronic liver infection, and that although he tested positive

for Hepatitis C, his viral load was negligible.  AR 345.  Judd prescribed hydrocodone and warned

Plaintiff that when he returned to Family Health Services, he would be subject to a drug test.  AR

345.

///

4

On May 8, 2013, Plaintiff complained of hip pain and showed Judd a wound on his lower leg that had been open "for ten or twelve years." AR 343; 698. Judd gave Plaintiff part of his pain prescription (Norco 10) pending the results of a drug test and referred him for treatment of the open wound. AR 343. After the drug test detected multiple opiates not prescribed for Plaintiff, Family Health Services notified Plaintiff that it would refuse future pain treatment. AR 325-30, 340-42. Nonetheless, when Plaintiff returned on June 10, 2013, limping and complaining of back, hip, and leg pain, Judd prescribed Tramadol. AR 338.

On July 8, 2013, Plaintiff returned and spent the appointment begging for a methadone prescription. AR 336. Judd declined treatment. AR 336. In August 2013, Plaintiff returned seeking a referral for treatment of the open leg wound and requesting methadone for pain. AR 333. Noting that the wound had been open for many years and that Plaintiff was otherwise alert and in no acute distress, Matthew De Temple, D.O., declined services based on Plaintiff's prior drug test failure and use of street drugs. AR 334. Plaintiff then began to abuse heroin instead of opiates. AR 331.

On January 14, 2014, Judd denied Plaintiff's request for narcotic pain pills but renewed his prescription for Prozac. AR 331. Plaintiff had a healing abscess on his left upper arm and complained of leg pain. AR 332.

**E.      Madera County Behavioral Health Services Administration**

On an intake form dated April 1, 2013, Madera County Behavior Health Services identified Plaintiff's diagnoses as major depression, opioid dependence, and amphetamine dependence. AR 373. Although Plaintiff had received outpatient treatment, he had never been hospitalized for psychiatric treatment. AR 377. He used Vicodin and an inhaler to treat chronic pain and cirrhosis, and had used heroin since he was thirteen years old. AR 378.

Plaintiff's affect was congruent to mood and appropriate to the situation but was blunted, restricted, and labile. AR 383. Plaintiff reported significantly diminished interest or pleasure in previously satisfying activities. AR 383. Speech was slow, low, slurred, and delayed. AR 383. Plaintiff was inattentive, unable to concentrate, and had poor immediate, recent, and long-term

memory.  AR 384-85.  His insight and judgment were poor.  AR 385.  Plaintiff had recently experienced suicidal ideation.  AR 385.

### F.  Psychiatric Consultation

Psychiatric consultant Ekram Michiel, M.D., examined Plaintiff on March 7, 2014.  AR 356-59.  Plaintiff's chief complaint was depression, which Plaintiff attributed to the 2001 murders of his sister and niece.[3]  AR 356.  He had no previous psychiatric hospitalization.  AR 356.  For medical history, Plaintiff told Dr. Michiel that he had Hepatitis C and a hole where an abscess was removed from his leg following a shooting.  AR 356.  Plaintiff had also been stabbed.  AR 356.  He recounted a long history of extensive drug use and reported that he had been arrested "15 or 16" times for crimes including attempted murder, robbery, and drugs.  AR 357.  Following a mental status examination, Dr. Michiel diagnosed:

| | |
|---|---|
| Axis I: | Substance dependence, mainly opioid dependence in sustained full remission by history.<br>Substance-induced psychiatric disorder.<br>Depressive disorder NOS. |
| Axis II: | Deferred. |
| Axis III: | Leg pain; Status post stab wound; Possible Hepatitis C. |
| Axis IV: | Stressors:  Health condition.  Social. |
| Axis V: | Global Assessment of Functioning: 55. |

AR 358.

Dr. Michiel opined that Plaintiff was "able to maintain attention and concentration to carry out simple job instructions," but would be unable to carry out an extensive variety of technical or complex instructions.  AR 359.  He could relate and interact with co-workers, supervisors, and the general public.  AR 359.  Plaintiff's activities of daily living were not

---

[3] No other reference to the alleged murders appears in the factual record.

restricted.  AR 359.

### G.    Internal Medicine Consultation

Internist Mickey Sachdeva, M.D., performed a consultative examination on March 17, 2014.  AR 362-366.  Plaintiff's chief complaint was hip pain that originated following surgery in 2007 to treat a hip abscess that resulted from intravenous drug abuse.[4]  AR 362.  Following a comprehensive physical examination, Dr. Sachdeva diagnosed polysubstance abuse and right hip pain attributable to mild degenerative changes.  AR 366.  He opined that Plaintiff had no "functional issues based solely on his medical issues."  AR 366.

### H.    Madera Community Hospital

On October 3, 2012, Plaintiff was admitted to Madera Community Hospital after he complained of depression and recent suicidal thoughts while being treated for abdominal pain.[5]  AR 591- 99; AR 604-13.  At one point in his medical treatment, Plaintiff left the hospital and was returned by police officers.  After Plaintiff's abdominal pain was relieved by Vicodin, hospital staff referred him to county mental health services, which cleared him for release the same day (October 3, 2012).  AR 599.

On October 14, 2014, radiologist Robert Brock Hansen, M.D., reviewed a five-view lumbar x-ray.  AR 491.  He identified (1) mild-to-moderate spondylosis[6] at L4-L5 and L5-S1 with endplate degenerative change and slight intervertebral disc narrowing, and (2) minimal spondylosis at L2-L3 and L3-L4.  AR 491. No fracture, spondylolyses, or spondylolistheseis was

---

[4] In a prior disability application, Plaintiff sought benefits based on hip pain resulting from treatment of the abscess.
[5] Plaintiff complained of abdominal ("liver") pain in the course of many emergency room visits.  Unlike the providers in Idaho, which rejected Plaintiff's pain complaints as intended to secure narcotics, Madera Community Hospital prescribed Vicodin, a narcotic drug.
[6] Spondylosis is "[a]nkylosis of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature."  Stedman's Medical Dictionary 840410 (Westlaw 2014).  Ankylosis is "[s]tiffening or fixation of a joint as the result of a disease process, with fibrous or bony union across the joint; fusion."  Stedman's Medical Dictionary 43650 (Westlaw 2014).

evident. AR 491.

Plaintiff went to the emergency department complaining of shortness of breath on October 26, 2014, and December 18, 2015. AR 480-84. Following evaluation, medical staff issued an inhaler. AR 483.

On January 19, 2015, the radiology department examined Plaintiff's right hand. AR 473. The x-rays revealed no fractures or dislocations; however, radiologist Frank A. Macaluso, M.D., observed "[m]oderately severe chronic degenerative changes DIP right fourth finger." AR 473. A flexion deformity at the DIP joint and deformity at the base of the distal phalanx likely reflected an old trauma. AR 473. Dr. Macaluso also noted mild chronic degenerative changes to the DIP joints of the second, third, and fourth fingers. AR 473.

Madera Community Hospital treated Plaintiff for skin abscesses on the following dates: June 4-7, 2012, right thigh; July 18, 2012, thigh; September 1, 2012, leg; September 16, 2013, location indecipherable; September 17, 2012, two sites; September 19, 2012, right thigh; September 21, 2012, right thigh; October 31, 2012, left thigh; December 14, 2012, left thigh; July 14, 2013; July 15, 2013, both thighs; July 16, 2013, right thigh; July 17, 2013, right thigh; July 19, 2013, left thigh; October 14, 2013, foot; October 16-19, 2013, foot;[7] October 23, 2013, foot; March 11, 2014, right arm; December 9, 2014, bilateral arm abscesses; May 10, 2015, right leg; August 3, 2015, left hip; August 10, 2015, right leg; November 3, 2015, left buttock; December 7, 2015, upper left arm. AR 415-18; 435-41; 442-50; 456-61; 465-69; 474-79; 492-551; 556-90; 616-666; 672-79; 684-95. On October 22, 2015, Plaintiff went to the emergency department complaining of an abscess in his left leg but left before he was examined. AR 451-53.

///

---

[7] Plaintiff developed cellulitis because of his failure to take prescribed antibiotics. AR 492.

///

I.    <u>Agency Physicians' Opinions</u>

On April 24, 2014, Helen C. Patterson, Ph.D., completed a mental residual functional capacity assessment.  AR 127-29.  Dr. Patterson opined that although Plaintiff had moderate limitation of his ability to understand and remember detailed instructions, he was capable of understanding simple and some complex instructions.  AR 128.  Similarly, despite some limitations of sustained concentration and persistence, Plaintiff retained "adequate capacity to complete tasks, follow instructions without substantial additional supervision, and to maintain adequate attention."  AR 128.  Plaintiff had some social limitations but, if public contact was limited, he had "adequate capacity to appropriately interact with supervisors and co-workers in a job setting."  AR 129.  Plaintiff was able to be aware of ordinary hazards, make work-related decisions, utilize transportation, and adapt to normal changes within a work environment.  AR 129.

On June 10, 2014, K. Loomis, M.D., completed the psychiatric review technique.  AR 140-41.  Dr. Loomis opined that Plaintiff's mental, affective, and substance addiction disorders did not satisfy the listing criteria of §§ 12.02A, 12.04A, or 12.09A.  AR 141.  With regard to the criteria of §§ 12.02B and 12.04B, Dr. Loomis opined that Plaintiff had moderate difficulties in maintaining social function and concentration, persistence, or pace, but had no restrictions of activities of daily living and no episodes of decompensation of extended duration.  AR 141.

Citing Plaintiff's drug-seeking behavior, Dr. Loomis assessed Plaintiff as "[p]artially credible":

> [Claimant] appears to have pain [management treatment] from 2/13 to 1/14.  He was given lighter pain meds including tramadol but [continued] to [complain of] pain and stated that [prescriptions] were not working.  [Claimant] specifically requested methadone on more

than one [occasion] and also threatened to return to heroin use if unable to get better pain meds. His [drug test urinalysis] in 5/13 was [positive] for substances that should not have been in his system and appears that sometime after this he was denied pain [management] and meds. He [reports] at 1/14 [office visit] that he did return to using heroin after his 8/13 [office visit] when he was declined for med [treatment], but states clean [for one month]. His [activities of daily living] are [somewhat limited], however, his homelessness appears to account for a large portion of his limits in his [activities of daily living].

AR 142.

Dr. Loomis opined that Plaintiff was capable of understanding simple and some complex instructions and retained adequate capacity to complete tasks, follow instructions without substantial additional supervision, and maintain adequate attention, concentration, persistence, and pace as needed to sustain a normal workday. AR 144. Although public contact should be reduced, Plaintiff was capable of interacting appropriately with supervisors and co-workers. AR 145. In short, Plaintiff had "adequate mental capacity to sustain simple, routine tasks [with occasional public contact." AR 145.

## J.      Family Health Services (California)

The record includes no documentation of any medical treatment by Family Health Services of Madera, California. On July 2, 2015, however, Judy Kelley, F.N.P., completed a Physical Medical Source Statement. (AR 370-71). According to Kelley, Plaintiff's diagnoses of lumbar spondylosis and right hand degeneration indicated permanent and chronic pain and decreased range of motion. AR 370. Plaintiff experienced pain in his back and right hand; his medications made him sleepy and impaired. AR 370. Emotional factors did not complicate Plaintiff's physical condition, but he was affected by an attention deficit. AR 370.

Nurse Kelley opined that Plaintiff could walk two blocks, sit for thirty minutes at a time, stand for one hour at a time, and stand and walk up to two hours in an eight-hour day. AR 370. Plaintiff must be able to change positions at will and walk ten minutes at a time every 45 minutes. AR 370. He would require three or four daily breaks of twenty minutes each and be off task at least 25 percent of the time. AR 370-71. Plaintiff did not need to elevate his legs, but he needed

to use a cane to avoid frequent falls.  AR 371.  He could rarely lift less than ten pounds and could never twist, stoop, crouch or squat, or climb stairs or ladders.  AR 371.  In an eight hour day, Plaintiff could not use right hand to grasp, turn or twist object, or to perform fine manipulations, and could use his left hand for those operations only forty per cent of the time.  AR 371.  Plaintiff could reach in front of his body or overhead only forty percent of the time with either arm.  AR 371.  In Kelly's opinion, because of his chronic pain and mental capacity, Plaintiff could not tolerate even low stress work.  AR 371.  He was likely to miss work four or more days each month.  AR 371.

On January 12, 2016, Kelly co-signed a physical medical source statement with Richard Thistle, M.D.  AR 372.  According to this statement, Plaintiff's symptoms for lumbar spondylosis and decreased range of motion were characterized by pain, fatigue, and abnormal gait.  AR 372.  Plaintiff could sit, stand, and walk less than two hours in an eight-hour day.  AR 372.  He would need three or four unscheduled breaks daily.  AR 372.  Plaintiff could rarely lift less than ten pounds and had reduced right hand grip strength.  AR 372.  Plaintiff would be off task 25 percent or more of the work day.  AR 372.

### K.      Addiction Treatment

In a letter dated March 7, 2016, three days before the administrative hearing, BAART Addiction Research and Treatment, Inc., confirmed that Plaintiff was enrolled in a methadone treatment program.  AR 319.  Plaintiff had earned take-home privileges that allowed him to pick up his medication twice monthly.  AR 319.  He participated in three fifty-minute counseling sessions monthly and was subject to one random urine test each month.  AR 319.

### IV.      Standard of Review

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits.  "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole."  *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).  Substantial evidence is evidence

within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and internal quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

**V.     The Disability Standard**

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if . . . his physical or mental impairment of impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

> 42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920(a)-(f). The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled. 20 C.F.R. §§ 416.920(a)(4). The ALJ must consider objective medical evidence and opinion testimony. 20 C.F.R. §§ 416.927; 416.929.

12

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level.  20 C.F.R. §§ 416.920(a)-(f).

In addition, when an applicant has one or more previous denials of applications for disability benefits, as Plaintiff does in this case, he or she must overcome a presumption of nondisability. The principles of *res judicata* apply to administrative decisions, although the doctrine is less rigidly applied to administrative proceedings than in court. *Chavez v. Bowen,* 844 F.2d 691, 693 (9th Cir. 1988); *Gregory v. Bowen,* 844 F.2d 664, 666 (9th Cir. 1988).

Social Security Acquiescence Ruling ("SSR") 97–4(9), adopting *Chavez,* applies to cases involving a subsequent disability claim with an unadjudicated period arising under the same title of the Social Security Act as a prior claim in which there has been a final administrative decision that the claimant is not disabled. A previous final determination of nondisability creates a presumption of continuing nondisability in the unadjudicated period.  *Lester v. Chater,* 81 F.3d 821, 827 (9th Cir. 1995). The presumption may be overcome by a showing of changed circumstances, such as new and material changes to the claimant's RFC, age, education, or work experience. *Id.* at 827–28; *Chavez,* 844 F.2d at 693.

## VI.     Summary of the ALJ's Decision and the Issues Presented

Acknowledging Plaintiff's previous applications for supplemental security income, the ALJ found that the circumstances had changed since Plaintiff's prior application in that Plaintiff's age category had changed and Plaintiff alleged new physical impairments.  AR 20.  Accordingly, she concluded that the presumption of continuing disability created by Acq. Rul. 97-4(9) did not apply.  AR 20.

///

13

Then, using the Social Security Administration's five-step sequential evaluation process, the ALJ determined that Plaintiff did not meet the disability standard. AR 20-29. The ALJ found that Plaintiff had not engaged in substantial gainful activity since October 1, 2014 (the amended alleged onset date). AR 23. Plaintiff's severe impairments included (1) lumbar degenerative joint disease, (2) right hand degenerative joint disease, and (3) depression. AR 23. The severe impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d); 416.925; and 416.926). AR 26. The ALJ found that the intensity, persistence, and limiting effects of Plaintiff's severe impairments according to Plaintiff's subjective complaints were inconsistent with the evidence as a whole. AR 27. The ALJ concluded that:

> [T]he claimant has the residual functional capacity to lift and carry 20 pounds occasionally, 10 pounds frequently, sit 6 to 8 hours, and stand and walk 6 to 8 hours in an 8-hour workday. He can occasionally stoop, crouch, and crawl; frequently climb, kneel, and balance. He can occasionally forceful[ly] grip and grasp with the right upper extremity and can perform simple routine tasks.

> AR 27.

At step five, the ALJ relied on the testimony of a vocational expert to find that Plaintiff was incapable of performing any of his past relevant work. AR 28. Plaintiff could perform other jobs available in the national economy, such as palletizer, DOT No. 929.687-054, SVP 2, light/unskilled with 337,618 positions nationally; garment sorter, DOT No. 222.687-014, SVP 2, light/unskilled with 236,018 positions nationally; and package operator, automatic, DOT No. 920.685-082, SVP 2, light/unskilled with 175,593 positions nationally. AR 29. Accordingly, the ALJ found that Plaintiff was not disabled. AR 29.

Plaintiff challenges the agency's decision contending that the ALJ improperly rejected Plaintiff's pain and symptom testimony. Doc. 16 at 4-10. The Commissioner disagrees, contending that Plaintiff's subjective testimony was inconsistent with the objective medical evidence of record and that the ALJ's finding that Plaintiff lacked credibility was supported by substantial evidence. Doc. 17 at 5-9.

**VII.    Credibility of Plaintiff's Pain and Symptom Testimony**

Plaintiff contends that the ALJ's decision "lacks the support of substantial evidence and rests on legal error," because the ALJ failed to articulate specific and legitimate reasons for rejecting Plaintiff's pain and symptom testimony. The Commissioner counters that the ALJ was not required to grant benefits based on Plaintiff's subjective testimony. Following its review of the record as a whole, including careful consideration of Plaintiff's testimony and the objective medical evidence of record, the Court concludes that the ALJ did not err.

**A.    Applicable Law**

An ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). His or her findings of fact must be supported by specific, cogent reasons. *Rashad v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990). To determine whether the ALJ's findings are supported by substantial evidence, a court must consider the record as a whole, weighing both the evidence that supports the ALJ's determination and the evidence against it. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). If the evidence could reasonably support either outcome, a court may not substitute its judgment for that of the ALJ. *Flaten v. Sec'y, Health and Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

A claimant's statement of pain or other symptoms is not conclusive evidence of a physical or mental impairment or disability. 42 U.S.C. § 423(d)(5)(A); Soc. Sec. Rul. 16-3p, 2017 WL 5180304 (Oct. 25, 2017). "An ALJ cannot be required to believe every allegation of [disability], or else disability benefits would be available for the asking, a result plainly contrary to the [Social Security Act]." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

An ALJ performs a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. *See Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014); *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). First, the claimant must produce objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged. *Garrison*, 759 F.3d at 1014; *Smolen*, 80

F.3d at 1281-1282. If the claimant satisfies the first step and there is no evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of his symptoms only if he makes specific findings that include clear and convincing reasons for doing so. *Garrison*, 759 F.3d at 1014-15; *Smolen*, 80 F.3d at 1281. "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834.

"An ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment." *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007) (internal citations and quotation marks omitted). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834. An ALJ's decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." Social Security Ruling ("SSR") 96-7p.[8]

"Generally a claimant's credibility becomes important at the stage where the ALJ is assessing residual functional capacity, because the claimant's subjective statements may tell of

---

[8] Social Security Ruling 96-7p was superseded by Ruling 16-3p, effective March 28, 2016. See 2016 WL 1020935, *1 (March 16, 2016); 2016 WL 1131509, *1 (March 24, 2016) (correcting SSR 16-3p effective date to March 28, 2016); 2017 WL 5180304, *2 (Oct. 25, 2017) (further correcting SSR 16-3p). Although the second step has previously been termed a credibility determination, recently the Social Security Administration ("SSA") announced that it would no longer assess the "credibility" of an applicant's statements, but would instead focus on determining the "intensity and persistence of [the applicant's] symptoms." See SSR 16-3p, 2016 WL 1020935 at *1 ("We are eliminating the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term. In doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character."). Social Security Rulings reflect the SSA's official interpretation of pertinent statutes, regulations, and policies. 20 C.F.R. § 402.35(b)(1). Although they "do not carry the force of law," Social Security Rulings "are binding on all components of the [SSA]" and are entitled to deference if they are "consistent with the Social Security Act and regulations." 20 C.F.R. § 402.35(b)(1); *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009) (citations and quotation marks omitted).

As the Ninth Circuit recently acknowledged, SSR 16-3p "makes clear what our precedent already required: that assessments of an individual's testimony by an ALJ are designed to 'evaluate the intensity and persistence of symptoms after [the ALJ] find[s] that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms,' and not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness." *Trevizo v. Berryhill*, 871 F.3d 664, 678 n.5 (9th Cir. 2017) *see also Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (Posner, J.) ("The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain assertions by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence.") SSR 16-3p became effective after the issuance of the ALJ's decision and after the Appeals Council had denied review in the instant case. When a federal court reviews the final decision in a claim, the district court is to apply the rules in effect when the decision was issued by the agency. SSR 16-3p, 2017 WL 5180304 at *1 (Oct. 25, 2017).

greater limitations than can medical evidence alone." *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (2001). "For this reason, the ALJ may not reject the claimant's statements regarding her limitations *merely* because they are not supported by objective evidence." *Id.* (citation omitted) (emphasis added). In assessing the claimant's credibility, the ALJ may use "ordinary techniques of credibility evaluation," considering factors such a lack of cooperation during consultative examinations, a tendency to exaggerate, inconsistent statements, an unexplained failure to seek treatment, inconsistencies between the testimony and conduct; and inconsistencies between daily activities and the alleged symptoms. *Id.* at 6; *also see Smolen*, 80 F.3d at 1284; *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (including as factors claimant's reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, work record, and testimony from physicians and third parties about the nature, severity, and effect of the alleged disabling symptoms). In evaluating the credibility of symptom testimony, the ALJ must also consider the factors set out in SSR 88-13, including the claimant's work record and physicians' observations regarding the nature, intensity and effect of the alleged symptoms. *See* SSR 88-13; *Smolen*, 80 F.3d at 1284; *Thomas*, 278 F.3d at 959. "If the ALJ finds that the claimant's testimony as to the severity of her pain and impairments is unreliable, the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas*, 278 F.3d at 958. In other words, the ALJ "must give specific, convincing reasons for rejecting a claimant's subjective statements." *Tonapetyan*, 242 F.3d at 1149. If the ALJ's credibility finding is supported by substantial evidence in the record, courts "may not engage in second-guessing." *Thomas*, 278 F.3d at 959.

**B.       The Hearing Decision**

The ALJ wrote:

> I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and

limiting effects of these symptoms are not entirely consistent with the evidence for the reasons explained in this decision.

In this case, the claimant's allegations are not fully consistent with the evidence. The claimant received little treatment for abscesses with routine follow-up. In addition, there was no mention of surgery or extraordinary therapies or hospitalizations or actual prescription of any assistive device. Physical examinations have been otherwise normal. The claimant's credibility is further undermined by the diagnostic and other objective medical evidence, which failed to show a physiological basis for the extreme pain and limitation alleged.

The claimant also reported mental problems, but there are no reports of psychiatric hospitalization, mental health treatment, or counseling. In addition, the claimant has not required any significant treatment for this condition except medications. For these reasons, I give little weight to the claimant's allegation of disability because they are not supported by the overall medical evidence of record or opinion evidence.

In sum, the above residual functional capacity assessment is supported by the overall medical evidence of record for the reasons discussed above. The extent of the claimant's subjective complaints is not supported by the medical evidence of record and his credibility is diminished because of inconsistent statements and unsupported allegations.

AR 27 (citations to record omitted).

By finding that Plaintiff's medically determinable impairments could reasonably cause the symptoms that Plaintiff alleged, the ALJ found that Plaintiff had satisfied step one of the credibility analysis. *Smolen*, 80 F.3d at 1281-1282.

Because the ALJ did not find that Plaintiff was malingering, she was required to provide clear and convincing reasons for rejecting Plaintiff's testimony. *Smolen*, 80 F.3d at 1283-1284; *Lester*, 81 F.3d at 834. In making her decision, the ALJ rejected Plaintiff's testimony as inconsistent with the minimal treatment provided for the severe impairments being considered in this application. "Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility testimony." *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005). "Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony." *Carmickle v. Commissioner*, 533 F.3d 1155, 1161 (9th Cir. 2008).

In light of the near absence of treatment of Plaintiff's three new impairments, the Court agrees with the ALJ that Plaintiff failed to establish disability.

### 1.      <u>Skin Abscesses</u>

Although neither Plaintiff's frequent treatment for skin abscesses nor the heroin habit that gave rise to the abscesses[9] are at issue in this case, Plaintiff objects to the ALJ's statement: "The claimant received little treatment for abscesses with routine follow-up" (AR 27).  Doc. 16 at 7. Plaintiff argues that the ALJ erred in rejecting his credibility based on the limited treatment provided for his impairments.  The Commissioner acknowledges that Plaintiff received treatment for abscesses within the time period covered by the pending application and that Plaintiff testified that he had stopped using heroin one year before the hearing so that he no longer experienced skin abscesses.  Doc. 17 at 10.  The Commissioner adds that since the abscesses are readily controlled with medication, they cannot form a basis for a finding of disability nor support a claim of excess pain.  Doc. 17 at 10.  *See Matthews v. Shalala*, 10 F.3d 678, 679-80 (9th Cir. 1993) (limited treatment and minimal use of medications are permissible factors in assessing credibility of pain testimony).

The ALJ initially found that "treatment records . . . showed that the claimant received limited treatment for abscesses with little routine follow-up."  AR 23.  The ALJ's assessment is correct.  With the exception of a single instance in which Plaintiff required further treatment when he failed to take his antibiotics, each abscess was addressed by a single emergency room treatment to drain the abscess and prescribe antibiotics.  As detailed in the factual background above, the record fully supports the ALJ's assessment of Plaintiff's multiple skin abscesses.

### 2.      <u>Leg and Back Pain</u>

In the disability application that is the subject of this appeal, Plaintiff alleged *right* leg pain.  AR 20.  At the hearing, he testified to constant lower back and leg pain, and testified that he required a cane to balance, but his testimony tied his falls to numbness related to the long wound

---

[9] The skin infections that eventually resulted in abscesses requiring medical treatment arose from Plaintiff's long-term habit of "skin-popping," that is, injection of heroin beneath the skin rather than into a vein.  *See* AR 105.

19

on his *left* calf. AR 45-46. That wound, which resulted from 2008 incision and drainage surgery to address a deep abscess, was previously evaluated and rejected as a source of disability in the 2012 denial of supplemental security income. *See* AR 104.

At the hearing, however, Plaintiff amended the onset date of his disability to October 1, 2014, a date just before x-rays revealed minimal to moderate degeneration of Plaintiff's lumbar spine. AR 38. Although the calf pain Plaintiff describes is different from the radiculopathy associated with lumbar spine degeneration, he now apparently attributes his back and leg pain to the mild-to-moderate deterioration of a portion of his lumbar spine that was first revealed by the October 2014 x-rays.

X-rays ordered by Nurse Kelley and taken October 14, 2014, showed (1) "[m]ild-to-moderate spondylosis at L4-L5 and L5-S1with endplate degenerative change and slight intervertebral disc space narrowing," (2) "[m]inimal spondylosis at L2-L3 and L3-L4," and (3) "no fracture, spondylolyses, or spondylolisthesis." AR. 491. Thereafter, Nurse Kelley's July 2, 2015, physical medical source statement attributed "frequent falls, pain, fatigue, abnormal gait" (AR 370 at ¶ 4), and back pain to these signs of vertebral degeneration and opined that Plaintiff experienced "permanent & chronic pain & decreased [range of motion]," as a result. AR 370. Kelley failed to "characterize the nature, location, frequency, precipitating factors, and severity of [Plaintiff's] pain" as requested by the report form. AR 370 at ¶ 5. As detailed in the factual background above, Kelley opined that Plaintiff's residual functional capacity was very limited. AR 370-71. Because Kelley was not an acceptable source of medical information under 20 C.F.R. § 416.1513, as the regulation existed on the date of the hearing decision, the ALJ gave her opinion little weight.

On January 12, 2016, Kelley and Richard Thistle, M.D., co-signed a shorter physical medical source statement which diagnosed lumbar spondylosis, indicated "chronic pain and decreased range of motion" as prognosis, and again omitted the requested detail concerning the specifics of Plaintiff's back pain. AR 372. As detailed in the factual background above, Nurse

///

20

Kelley and Dr. Thistle opined that Plaintiff's residual functional capacity was very limited. AR 372.

The ALJ gave little weight to Dr. Thistle's opinion, finding it inconsistent with the medical record as a whole. AR 26. The ALJ's assessment was appropriate since Dr. Thistle's and Nurse Kelley's opinions were not supported by any treatment notes in the record documenting assessment of Plaintiff's range of motion, nor any treatment related to Plaintiff's spondylosis by Thistle, Kelley, or any other medical professional at Family Health Services (California), or by any other medical provider. Plaintiff himself testified that he had received no treatment for his back condition. AR 45. *See Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) (absence of treatment of back pain is sufficient to discount claimant's testimony).

The record as a whole does not support a conclusion that Plaintiff's minimal-to-moderate spondylosis result in his frequently falling. Nothing in the medical record documents that Plaintiff was ever treated for any injury resulting from a fall nor ties Plaintiff's claim of frequent falling due to numbness (*see* AR 45-46) to his back condition. No evidence ties Plaintiff's claims of requiring a cane due to imperfect balance to the spinal degeneration identified in the x-rays nor indicates medical treatment to address lack of balance. Plaintiff's mother reported that doctors had not prescribed the cane, which Plaintiff bought for himself at the Dollar Store.

The ALJ appropriately rejected Plaintiff's claims of disabling back and leg pain as inconsistent with the evidence as a whole and specifically, with the medical records submitted in support of his claim.

### 3. Right Hand Degenerative Joint Disease

The only medical record pertaining to degenerative joint disease is the x-ray of Plaintiff's right hand on which Dr. Macaluso identified moderately severe chronic degenerative changes in a single finger joint and mild degenerative changes in three other finger joints. Plaintiff testified that, three or four times monthly, the fingers of his right hand "lock up" and he is unable to move them for five to ten minutes. Nothing in the medical record establishes that Plaintiff has ever

*///*

received any treatment specifically for the degenerative changes in several joints of his right hand. Plaintiff testified that his doctor said "there's nothing he can do about it." AR 49.

Nurse Kelley opined that Plaintiff could never use his right hand to grasp, turn, or twist objects or for fine manipulations. AR 371. As previously noted, the ALJ gave Kelley's opinion little weight since she was not an acceptable source of medical information under 20 C.F.R. § 416.1513. Dr. Thistle opined that Plaintiff had significant limitations with reach, handling, or fingering due to "decreased right hand grip strength." AR 372. Nothing in the record indicates that Plaintiff's hand strength was ever objectively assessed by any medical professional.

Of itself, this impairment does not give rise to an issue of the ALJ improperly evaluating Plaintiff's credibility. The ALJ credited Plaintiff's testimony and found that Plaintiff could occasionally grip and grasp (AR 25).

### 4. Depression

Plaintiff testified that the fluoxetine prescribed for depression "helps me a lot," and that he wanted "to see a psych, but the last time I went, they said they weren't accept the medical card . . . that I have . . . because I'm suicidal." AR 51. When the ALJ asked how often Plaintiff felt suicidal, his response was equivocal:

> I don't know, just two times, I guess when I'm just getting – about, I'd say about three or four or five times during the month, you know what I mean, I just, you know, just start feeling, you know, my past histories actually, you know, starts getting to me, you know what I mean.
>
> All the time I've done in prison and stuff, you know, things I've done to people and stuff, you know what I mean. It just – I'm just, you know – the way I live, you know what I mean. I'm just tired of it, you know what I mean.
>
> I sometimes I just feel like giving up, you know, but, you know, it's – you know, I'm trying to get a better life and I just – like all I can do is fight, and I do that every day of my life.
>
> AR 51-52.

Although the ALJ acknowledged Plaintiff's history of depression and various mental health complaints, she relied on objective evidence to conclude that Plaintiff's subjective

statements were not supported by other evidence in the record. AR 27. The Court finds the

ALJ's reasoning and the evidence on which she relied to be clear and convincing.

In particular, the ALJ relied on the lack of any significant mental health treatment. AR

27. Other than a prescription for an antidepressant, the record shows no mental health treatment.

In October 2012, Plaintiff complained of depression and suicidal thoughts while being treated for

abdominal pain in the emergency department of Madera Community Hospital. Emergency room

personnel contacted county mental health services which cleared Plaintiff for release the same

day after his abdominal pain had been treated. AR 599. Although the Madera County Behavioral

Health Services Administration had completed the intake interview for services in April 2013, no

evidence in the record shows that Plaintiff was actually treated there.

The ALJ gave significant weight to the opinion of the consulting examiner Dr. Michiel,

which the ALJ found to be consistent with the record as a whole. AR 26. She found that Dr.

Michiel's evaluation acknowledged that Plaintiff experienced depression and other mental health

problems but concluded that Plaintiff was able to perform simple, routine tasks. AR 27. The ALJ

allotted less weight to the opinion of Dr. Patterson, a non-examining psychologist, who also

opined that Plaintiff could perform simple routine tasks but limited employment to an

environment with only occasional public contact. AR 27. The ALJ found little support in the

record for the limitation of public contact. AR 27.

### 5.     Inconsistent Statements and Unsupported Allegations

The ALJ's final statement accurately summarizes her reasoning in denying benefits:

Plaintiff's representations of his physical and mental impairments are not supported by the

objective medical evidence in the record.

### VIII.   Conclusion and Order

Based on the foregoing, the Court finds that the ALJ's decision that Plaintiff is not

disabled is supported by substantial evidence in the record as a whole and is based on proper legal

standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of

the Commissioner of Social Security. The Clerk of Court is directed to enter judgment in favor of

Defendant, Nancy A. Berryhill, Acting Commissioner of Social Security, and against Plaintiff, Ricky Colmenero.

IT IS SO ORDERED.

Dated: __August 21, 2018__          _____/s/ Gary S. Austin_____
                                                   UNITED STATES MAGISTRATE JUDGE